## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ROYAL HAGERTY, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. _____ |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| LIBERTY PROPERTY TRUST, WILLIAM P. HANKOWSKY, THOMAS C. DELOACH JR., KATHERINE DIETZE, ANTONIO FERNANDEZ, DANIEL P. GARTON, ROBERT G. GIFFORD, DAVID L. LINGERFELT, MARGUERITE NADER, LAWRENCE D. RAIMAN, and FREDRIC J. TOMCZYK, | ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff, Royal Hagerty, by his undersigned attorneys, for this complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.    This is an action brought by Plaintiff against Liberty Property Trust ("Liberty" or the "Company") and the members of the Company's board of trustees (collectively referred to as the "Board" or the "Individual Defendants" and, together with the Company, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9.  Plaintiff's claims arise in connection with the proposed acquisition of Liberty by Prologis, Inc. ("Prologis").

1

2.      On October 27, 2019, Liberty and Prologis entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Liberty will merge with and into Prologis and its affiliates, with Prologis and its affiliates continuing as the surviving corporation(the "Proposed Transaction").

3.      Pursuant to the terms of the Merger Agreement, Liberty's shareholders will be entitled to receive 0.675 shares of Prologis common stock (the "Exchange Ratio" or the "Merger Consideration").  Based on the trading price of Prologis common stock at closing on the last day before the Proposed Transaction was announced, the Merger Consideration was worth approximately $61.32 per share of Liberty common share.

4.      On or about December 18, 2019, in order to convince Liberty's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading S-4/A Registration Statement (the "Registration Statement") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      In particular, the Registration Statement contains materially incomplete and misleading information concerning the background of the Proposed Transaction and the valuation analyses performed by Liberty's financial advisors, Goldman Sachs & Co. LLC ("Goldman Sachs") and Citigroup Global Markets Inc. ("Citi" and, together with Goldman Sachs, the "Financial Advisors") regarding the Proposed Transaction.

6.      The special meeting of the Company's shareholders to vote on the Proposed Transaction is scheduled for January 30, 2020 (the "Shareholder Vote").  Therefore, it is imperative that the material information that has been omitted from the Registration Statement is disclosed prior to the special meeting, so Plaintiff can properly exercise his corporate voting rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff

seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Liberty's public common shareholders sufficiently in advance of the upcoming shareholder vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District.  Indeed, Liberty's common shares trade on the New York Stock Exchange ("NYSE"), which is headquartered in this District.  *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Liberty common shares.

12.     Defendant Liberty, together with its subsidiaries, is a self-administered and self-managed Maryland real estate investment trust that is a leader in commercial real estate, serving customers in the United States and United Kingdom, through the development, acquisition, ownership and management of superior logistics, warehouse, manufacturing, and research & development facilities in key markets.  Liberty is structured as an umbrella partnership Real Estate Investment Trust ("REIT") under which substantially all of Liberty's current and future business is, and will be, conducted through the operating partnership Liberty Property Limited Partnership ("Liberty OP"). Liberty has its principal executive officers located at 650 East Swedesford Road, Suite 400, Wayne, Pennsylvania 19087.  Liberty's common shares are traded on the NYSE under the ticker symbol "LPT."

13.     Individual Defendant William P. Hankowsky ("Hankowsky") is, and has been at all relevant times, the Company's President and Chief Executive Officer ("CEO"), and Chairman of the Board of Trustees.

14.     Individual Defendant Thomas C. DeLoach, Jr. ("DeLoach") is, and has been at all relevant times, a trustee of the Company.

15.     Individual Defendant Katherine Dietze ("Dietze") is, and has been at all relevant times, a trustee of the Company.

16.     Individual Defendant Antonio Fernandez ("Fernandez"), is and has been at all relevant times, a trustee of the Company.

17.     Individual Defendant Daniel P. Garton ("Garton") is, and has been at all relevant times, a trustee of the Company.

18.     Individual Defendant Robert G. Gifford ("Gifford") is, and has been at all relevant times, a trustee of the Company.

19.     Individual Defendant David L. Lingerfelt ("Lingerfelt") is, and has been at all relevant times, a trustee of the Company.

20.     Individual Defendant Marguerite Nader ("Nader") is, and has been at all relevant times, a trustee of the Company.

21.     Individual Defendant Lawrence D. Raiman ("Raiman") is, and has been since April 2019, a trustee of the Company.

22.     Individual Defendant Fredric J. Tomczyk ("Tomczyk") is, and has been at all relevant times, a trustee of the Company.

23.     The Defendants identified in paragraphs 13 through 22 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with the Company, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

24.     Liberty is a leader in commercial real estate, serving customers in the United States and United Kingdom, through the development, acquisition, ownership and management of superior logistics, warehouse, manufacturing, and research & development facilities in key markets. As of September 30, 2019, Liberty owned interests in 580 properties in operation, comprised of approximately 111.7 million square feet, 26 properties under development, which when completed are expected to comprise approximately 5.2 million square feet, and three properties held for redevelopment or as value-added, comprising approximately 140,000 square feet, as well as approximately 1,700 acres of developable land.

25.     Liberty has grown considerably during the past few years and is well-positioned for

continued growth.  For example, on July 30, 2019, Liberty issued a press release entitled *Liberty Property Trust Announces Second Quarter 2019 Results*, which reported positive results and reaffirmed Liberty's excellent future prospects, stating in part:

> "Liberty's second quarter activity was characterized by high leasing volume coupled with very attractive lease economics," said Bill Hankowsky, chairman and chief executive officer. "This execution reflects the enduring strength of this remarkable industrial market, which provides unprecedented opportunity to achieve high retention rates while at the same time drive rents, minimize leasing costs, and lock in longer lease terms with contractual rent increases on every lease."

26.     Indeed, on the earnings call accompanying the July 30, 2019 press release, Defendant Hankowsky reiterated Liberty's bright future, thanks in part to the "unprecedented opportunity" for "long-term real estate operators" in the industrial real estate market.  Hankowsky also reiterated that Liberty's long-term strategies positioned Liberty to drive growth and enhance shareholder value.

27.     Thus, the Proposed Transaction comes at a time when Liberty's recent and future success was not fully reflected by its share price. The Proposed Transaction will "compensate" Liberty's public shareholders with a Merger Consideration that fails to adequately compensate them for the intrinsic value of their shares.

28.     Despite Liberty's intrinsic value and growth prospects, the Individual Defendants are agreeing to a merger that deprives Liberty's public shareholders of the ability to partake in the Company's individual growth and instead dilutes the value of their Liberty shares with an inadequate interest in Prologis.  The Individual Defendants breached their fiduciary duties owed to Liberty's shareholders by agreeing to the Proposed Transaction for the unfair Merger Consideration, and by allowing the unfair and flawed sales process to unfold in the manner that it did, which will cause Plaintiff and the Class to receive an inadequate Merger Consideration while Company insiders receive millions of dollars in severance payments and accelerated vesting of their restricted stock units.

**Background of the Merger and the Announcement of the Proposed Transaction**

29.     Defendant Hankowsky and Hamid R. Moghadam ("Moghadam"), Prologis' Chief

Executive Officer, discussed a possible acquisition of Liberty at least as far back as Fall 2017 and spoke informally regarding Prologis' interest acquiring Liberty on several occasions during the two-year period between Fall 2017 and September 2019.  Registration Statement, 57.

30.    On September 13, 2019, Moghadam, while speaking with a representative of Goldman Sachs, indicated that Prologis was interested in acquiring Liberty in a stock-for-stock transaction that valued Liberty at $60.00 per share of Liberty common shares, an approximately 15% pro forma ownership of the combined company for Liberty's shareholders.  Registration Statement, 58.

31.    On September 18, 2019, Moghadam reiterated this proposal directly to Defendant Hankowsky on September 18, 2019, and further indicated "Moghadam's expectation that the Prologis board and management team would manage the post-closing operations of the Combined Company, with the potential for some Liberty employees to continue working for the Combined Company." Registration Statement, 58.

32.    On September 20, 2019, Liberty's Board instructed the Financial Advisors to contact Party A, an investment firm active in the industrial property sector, to obtain by September 25, 2019 Party A's view on Liberty's valuation and gauge Party A's interest in acquiring Liberty.  Registration Statement, 58.

33.    On September 25, 2019, Party A indicated that "any offer by Party A would likely be at the low end of a 10-15% premium range over the price of Liberty common shares, which closed at $50.93 on September 24, 2019," or between $56.23 to $58.57 per share of Liberty common shares. Registration Statement, 58.

34.    The following day, September 26, 2019, the Board held its regularly scheduled meeting, at which time the Board authorized Liberty's senior management and its Financial Advisors to continue engaging in dialogue with Prologis regarding the potential transaction, and to pursue a

transaction in accordance with the structure and terms that Hankowsky had proposed the week before. Registration Statement, 59. The Board further "agreed that if an agreement in principle on the terms of such a transaction could be reached, an appropriate period of exclusivity would likely be established in which the parties would seek to enter into a definitive agreement." *Id.*

35.   On September 30, 2019, Liberty and Prologis executed a nondisclosure agreement with "customary mutual standstill and confidentiality restrictions" and an exclusivity provision that ran through October 29, 2019. Registration Statement, 59.

36.   On October 22, 2019, Moghadam informed Hankowsky that Prologis was amending the proposed merger consideration in its proposal from an Exchange Ratio that contemplated a 15% pro forma ownership in the combined companies for Liberty's shareholders to an Exchange Ratio that contemplated a 14% pro forma ownership in the combined companies for Liberty's shareholders "in light of the recent relative trading performance of Prologis common stock and Liberty common shares." Registration Statement, 60.

37.   On the evening of October 27, 2019, Liberty and Prologis issued a joint press release publicly announcing the Proposed Transaction:

### PROLOGIS TO ACQUIRE LIBERTY PROPERTY TRUST FOR $12.6 BILLION

***One of the highest-quality U.S. logistics REITs will merger into the Prologis platform***

SAN FRANCISCO and WAYNE, Pa., Oct. 27, 2019 /PRNewswire/ -- Prologis, Inc. (NYSE: PLD) and Liberty Property Trust (NYSE: LPT) today announced that the two companies have entered into a definitive merger agreement by which Prologis will acquire Liberty in an all-stock transaction, valued at approximately $12.6 billion, including the assumption of debt. The board of directors of Prologis and the board of trustees of Liberty have each unanimously approved the transaction.

"Liberty's logistics assets are highly complementary to our U.S. portfolio and this acquisition increases our holdings and growth potential in several key markets," said Prologis chairman and CEO Hamid R. Moghadam. "The

strategic fit between the portfolios allows us to capture immediate cost and long-term revenue synergies."

The transaction deepens Prologis' presence in target markets such as Lehigh Valley, Chicago, Houston, Central PA, New Jersey and Southern California.

The acquisition on an owned and managed basis comprises:

- 107 million square foot logistics operating portfolio; 87 percent overlap with key markets
- 5.1 million square feet of logistics development in progress
- 1,684 acres of land for future logistics development with build-out potential of 19.7 million square feet
- 4.9 million square foot office operating and development portfolio

Prologis plans to dispose of approximately $3.5 billion of assets on a pro rata share basis. This includes $2.8 billion of non-strategic logistics properties and $700 million of office properties.

"Liberty and Prologis represent two of the finest teams of real estate professionals and two of the finest portfolios of industrial real estate ever assembled," said Bill Hankowsky, Liberty chairman and chief executive officer. "The joining of these two platforms at this moment, when industrial logistics has become so pivotal to the new economy, will further the industry's ability to support the nation's supply chain and enhance value creation for our combined shareholders. It is a testament to Liberty's outstanding teams of professionals, both present and past."

"Liberty's high-quality logistics real estate will strengthen our portfolio as well as our customer roster," said Prologis chief investment officer Eugene F. Reilly. "We are also excited about the caliber of talent at Liberty and expect a number of their employees to join us to help manage the portfolio and execute on capital deployment."

This transaction is anticipated to create immediate cost synergies of approximately $120 million from corporate general and administrative cost savings, operating leverage, lower interest expense and lease adjustments. Initially, this transaction is expected to increase annual core funds from operations* (Core FFO) per share by $0.10-$0.12. Upon stabilization of the acquired development assets, completion of the planned non-strategic asset sales and redeployment of the related proceeds, annual stabilized Core FFO per share is forecasted to increase by an additional $0.04 per share for a total of $0.14-$0.16.

Further, there are future synergies with the potential to generate approximately $60 million in annual savings, including $10 million from revenue synergies and $50 million from incremental development value creation.

"The execution of this transaction is further evidence of the strength of Prologis' balance sheet and will create significant additional capital from the future sale of the non-core assets," said Prologis chief financial officer Thomas S. Olinger.

9

"The combination of these portfolios will drive incremental Core FFO growth and long-term shareholder value."

Under the terms of the agreement, Liberty shareholders will receive 0.675x of a Prologis share for each Liberty share they own. The transaction, which is currently expected to close in the first quarter of 2020, is subject to the approval of Liberty shareholders and other customary closing conditions.

BofA Securities and Morgan Stanley are acting as financial advisors and Wachtell, Lipton, Rosen & Katz is serving as legal advisor to Prologis. Goldman Sachs and Citigroup are acting as financial advisors and Morgan, Lewis and Bockius LLP is serving as legal advisor to Liberty.

*This is a non-GAAP financial measure. Due to the impact of non-cash real estate depreciation, Prologis expects the acquisition to be dilutive to net earnings. See our Third Quarter 2019 Supplemental Information Report for our definition of Core FFO.

**The Preclusive Deal Protection Devices**

38.     To the detriment of the Company's public shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

39.     Section 7.4 of the Merger Agreement ("Acquisition Proposals; Changes in Recommendation") is a restrictive "no-shop" provision that prohibits the members of the Board from soliciting proposals relating to alternative offers or business combinations.

40.     Section 7.4(a) of the Merger Agreement strictly prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to proposals regarding alternative acquisitions or business combinations

41.     Among other things, Section 7.4 of the Merger Agreement also requires the Board to provide Prologis with written notice of any inquiry that could reasonably expected to lead to an Acquisition Proposal within twenty-four (24) hours of its receipt, and further requires that the Board provide prior written notice of its intention to terminate the Merger Agreement due to receipt of a Superior Proposal so that Prologis may negotiate with Liberty following Prologis' receipt of the notice

so that Prologis can adjust the terms and conditions of the Merger Agreement so that the Acquisition Proposal ceases to be a Superior Proposal.

42.     In addition, the Merger Agreement provides that the Company will be required to pay to Prologis a termination fee of $325,000,000.00 with respect to any termination under the No-Shop provisions of the Merger Agreement other than termination with respect to a Superior Proposal from a Qualified Bidder who made an unsolicited *bona fide* written Acquisition Proposal that remained pending at 11:59 p.m. (New York time) on November 26, 2019 that was reasonably expected to lead to a Superior Proposal and the Merger Agreement was terminated in favor of that Superior Proposal, in which case the Company will be required to pay to Prologis a termination fee of $150,000,000.00.

43.     Ultimately, these preclusive deal protection devices restrained and continue to restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company, and further restrain the Company's public shareholders' ability to disapprove the Proposed Transaction.

44.     Indeed, the Proposed Transaction was negotiated through a flawed and conflicted sales process pursuant to which Liberty reached out to just one potential counterparty and entered an exclusivity period with Prologis days after that potential counterparty expressed interest in acquiring Liberty at a valuation only slightly lower than Prologis' valuation.

45.     The aggregate effect of the preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for the Company's shares in the Proposed Transaction and the flawed and conflicted sales process pursuant to which the Proposed Transaction was negotiated, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

46.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the

irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

**The Registration Statement Omits Material Information**

47.     On or about November 26, 2019, in order to convince Liberty's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of the materially incomplete and misleading Registration Statement with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

48.     The special meeting of Liberty shareholders to vote on the Proposed Transaction is forthcoming.  The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Registration Statement misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction.

49.     Specifically, the Registration Statement omits two types of material information: (i) information regarding the background of the transaction, and (ii) information that renders the Company's Financial Advisors' fairness opinion materially false, misleading, or incomplete.

**A.  The Registration Statement Omits Material Information Regarding the Background of the Transaction**

50.     The Registration Statement fails to describe the Board's rationale and basis for (i) directing the Financial Advisors to contact Party A as the only potentially competing counterparty, and (ii) agreeing to an exclusivity period with Prologis just days after reaching out to Party A.  This information is material to Liberty's shareholders because Party A was the only potential counterparty that was contacted in the market check.

51.     The Registration Statement fails to disclose that the October 27, 2019 joint press release announcing the Proposed Transaction indicated that the Proposed Transaction was "subject to the approval of Liberty shareholders and other customary closing conditions" but did not indicate the

structure of the termination fee, which allowed competing counterparties to acquire Liberty at a substantial "discount" to the standard termination fee in the event that the Merger Agreement was terminated in favor of an unsolicited Acquisition Proposal.   This information is material to shareholders deciding whether to vote in favor of the Proposed Transaction because the Registration Statement implies that potentially competing counterparties would have been aware of the Termination Fee structure when they would not have been unless they had reviewed in fine detail the terms of the Merger Agreement itself.

52.     The Registration Statement fails to disclose (i) whether Liberty previously executed any standstill agreements with any other potential counterparties and, if so, (ii) whether those potential counterparties remain subject to standstill obligations, and (iii) whether any potential counterparties submitted unsolicited proposals during the period following the announcement of the Proposed Transaction.

**B.   The Registration Statement Omits Material Information Regarding the Fairness Analysis**

53.     The Registration Statement also omits material information regarding the Company's Financial Advisors' fairness opinion and the various valuation analyses that the Company's Financial Advisors performed to render the opinion. Furthermore, it fails to provide enough information regarding the necessary data, support for conclusions, or the existence of, or basis for, the underlying assumptions that underpin the fairness opinion.   Specifically, the Registration Statement does not disclose enough information regarding the financial projections, inputs and assumptions for various financial valuations.   Without this information, shareholders cannot replicate the analyses, confirm the valuations, evaluate the Financial Advisors' opinion that the Merger Consideration is fair, or accurately assess the reliability of the Fairness Opinion. The informative value of the Fairness Opinion is not in its conclusions, but in the valuation analyses that support them.   Thus, the key inputs, which are intrinsically baked into those conclusions, must also be fairly disclosed.

54.     With respect to the management projections, the Registration Statement fails to disclose material information. Concerning financial projections, directors are obligated to provide complete valuation metrics to shareholders, particularly in cash-out transactions where non-GAAP metrics were used by the banker, since such metrics are not uniformly defined and shareholders are therefore unable to assess the utility and legitimacy of the actual metrics without seeing the underlying components.  Notably, the Registration Statement fails to provide all of the financial projections provided by the companies' management and relied upon by the Company's Financial Advisors in rendering their opinions.

55.     With respect to the Company Projections beginning on Page 90, the Registration Statement fails to provide the following items: (i) Rental  and operating expense reimbursements, (ii) Property and real estate tax expenses from real estate operations, (iii) Depreciation and amortization expense, (iv) Interest expense, (v) Impairment charges and other non-cash items, (vi) Debt extinguishment gains, (vii) Gains on property dispositions, (viii) Income tax expense, (ix) Straight-line rent adjustments, (x) Income taxes, (xi) Capital expenditures, acquisitions and development, (xii) Any other items used in calculating unlevered free cash flow, (xiii) Any other items used in calculating funds from operations, and (xiv) Any items used in calculating adjusted funds from operations.  This information is especially material to Liberty's shareholders in light of the unlevered free cash flow projections for Prologis and the *pro forma* combined company, which contemplate marked free cash flow generation beginning in year 2021notwithstanding negative free cash flow in year 2020.

56.     With respect to Goldman Sachs' *Illustrative Discounted Cash Flow Analysis for Liberty and Prologis* beginning on Page 73, the Registration Statement fails to provide: (i) Goldman Sachs' basis and rationale for applying a discount rate range of 4.5% to 5.5%, (ii) Goldman Sachs' rationale and basis for calculating terminal values by applying exit terminal year EBITDA multiples

ranging from 20.0x to 24.0x and perpetuity growth rates ranging from 0.3% to 1.9% for Liberty but EBITDA multiples ranging from 23.0x to 27.0x and perpetuity growth rates ranging from 1.0% to 2.4% for Prologis, and (iii) a full sensitivity table presenting the implied company valuations across the full range of discount rates, terminal values, and perpetuity growth rates. Indeed, although Goldman Sachs applied the same discount rate range for Liberty and Prologis, Citi's discounted cash flow analysis applied a lower rate for Liberty than for Prologis even though both Goldman Sachs and Citi purportedly derived their discount rate ranges by application of the Capital Asset Pricing Model.

57.    With respect to Goldman Sachs' *Illustrative Present Value of Future Share Price Analyses for Liberty Standalone, Prologis Standalone and for the Pro Forma Value to be Received per Liberty Common Share* analysis beginning on Page 74, the Registration Statement fails to provide: (i) Goldman Sachs' rationale and basis for applying a discount rate of 5.5%  to the theoretical future values rather than the discount rate range of 4.5% to 5.5% that Goldman Sachs applied in its discounted cash flow analysis, (ii) Goldman Sachs' rationale and basis for applying a range of Next Twelve Months FFO multiples of 17.0x to 21.0x for Liberty, 22.0x to 26.0x for Prologis, and 21.5x to 25.5x for the pro forma combined company, (iii) a sensitivity table presenting the results of the analysis across the full range of multiples, and (iv) Goldman Sachs' rationale and basis for excluding from its analysis any projected valuations for year 2023.

58.    With respect to Goldman Sachs' *Illustrative Implied Premia of Precedent REIT Transactions* beginning on Page 76, the Registration Statement fails to disclose: (i) Goldman Sachs' rationale and basis for including transactions valued at $500 million, (ii) the number of transactions that were analyzed, (iii) the individual companies acquired in each transaction and the value of the company implied by the transaction, (iv) the date of each transaction, (v) whether each transaction involved cash consideration, stock consideration, or a cash/stock mix, and (vi) the premium paid in each transaction.  Without knowing how many transactions Goldman Sachs actually analyzed the

implied value of each acquired company, and the premium paid, it is impossible to determine whether Goldman Sachs' tabular summary of its results (which present only the 25th Percentile, mean, median, and 75th Percentile premia) fairly values the Company.  Indeed, including transactions valued at $500 million while Liberty is valued at upwards of $12 billion may dramatically understate the acquisition premium that would ordinarily be paid in actually comparable transactions.  *See, e.g., PNB Hldg. Co. S'holder Litig.*, Cons. C.A. No. 28-N, 2006 Del. Ch. LEXIS 158, at *96 n.125 (Del. Ch. Aug. 18, 2006); *Rosenblatt v. Getty Oil Co.*, Case No. 5278, 1983 Del. Ch. LEXIS 570, at *71-72 (Del. Ch. Sept. 19, 1983).

59.     With respect to Citi's *Discounted Cash Flow Analysis* beginning on Page 81 and Page 85, the Registration Statement fails to fully provide: (i) Citi's rationale and basis for calculating terminal values by applying exit terminal year EBITDA multiples ranging from 18.8x to 22.8x for Liberty, 22.1x to 26.1x for Prologis, and 22.1x to 26.1x for the combined company, (ii) Citi's rationale and basis for selecting discount rate ranges of 5.72% to 6.52% for Liberty, 6.44% to 7.38% for Prologis, and 6.44% to 7.38% for the combined company, and (iii) a full sensitivity table presenting the implied company valuations across the full range of discount rates and terminal values.

60.     With respect to Citi's *Selected Public Companies Analysis* beginning on Page 81, the Registration Statement fails to fully disclose: (i) the objective criteria Citi considered in selecting the Selected Public Companies, and (ii) the enterprise values for each of the Selected Public Companies.

61.     With respect to Citi's *Selected Precedent Transactions Analysis* beginning on Page 83, the Registration Statement fails to fully disclose: (i) the objective criteria Citi relied on in selecting the precedent transactions included in the analysis, (iii) the implied value of the company acquired in each transaction, and (iv) whether each transaction involved cash consideration, stock consideration, or a cash/stock mix. Without this information is impossible to determine whether observed transactions are a fair benchmark on which to value Liberty.  *See, e.g., PNB Hldg. Co. S'holder Litig.*,

2006 Del. Ch. LEXIS 158, at *96 n.125; *Rosenblatt*,1983 Del. Ch. LEXIS 570, at *71-72.

62.     If a proxy discloses financial projections and valuation information, such projections and valuations must be complete, accurate, and honest.  The question is not simply whether there is a duty to speak, but also whether there may be liability for not having spoken enough.  With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths.  *See Campbell v. Transgenomic, et al.*, No. 18-2198 (8th Cir., March 1, 2019) (noting that "half-truths" are actionable misrepresentations under securities laws and collecting cases).  Accordingly, Defendants have disclosed some of the information related to the projections, assumptions, and inputs relied upon by Defendants' financial advisors, but have omitted crucial line items, reconciliations, and other information.   Thus, Defendants' omission renders the projections disclosed in the Registration Statement misleading.

63.     In sum, the omission of the above-referenced information renders the Registration Statement materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the upcoming shareholder vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)

64.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

65.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national

securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

66.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

67.     The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

68.     Defendants have issued the Registration Statement with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information regarding the valuation analyses performed by the Company's Financial Advisors in support of its fairness opinion.

69.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

70.    The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that the Company's Financial Advisors reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by the Company's Financial Advisors, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review the Company's Financial Advisors' analyses in connection with their receipt of the fairness opinions, question the Company's Financial Advisors as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

71.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors.

Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

72.     The Company is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

73.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of the Company, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

76.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the

statements or cause the statements to be corrected.

77.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.   The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

78.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.   The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

79.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

80.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.   By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

81.    Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 20, 2019

**MONTEVERDE & ASSOCIATES PC**

By:   */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**ADEMI & O'REILLY, LLP**
Guri Ademi
Jesse Fruchter
3620 East Layton Avenue
Cudahy, Wisconsin 53110
Tel: (414) 482-8000
Fax: (414) 482-8001
Email: gademi@ademilaw.com
          jfruchter@ademilaw.com

*Attorneys for Plaintiff*